AO 91 (Rev. 11/11) Criminal Complaint  AUSA Kate Zell (312) 353-4305

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**FILED**
JUL 22 2014
THOMAS G BRUTON
CLERK, U S DISTRICT COURT

UNITED STATES OF AMERICA

v.

JOSE MELENDEZ

CASE NUMBER:
UNDER SEAL

**14 CR 406**

**CRIMINAL COMPLAINT**   MAGISTRATE JUDGE KIM

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about January 16, 2014, at Chicago, in the Northern District of Illinois, Eastern Division, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | knowing and intentional distribution of a controlled substance, namely, a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance |

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.

*[signature: Michael J. Walsh]*

MICHAEL J. WALSH
Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF)

Sworn to before me and signed in my presence.

Date: July 22, 2014

*[signature: Young B. Kim]*
Judge's signature

City and state: Chicago, Illinois

YOUNG B. KIM, U.S. Magistrate Judge
*Printed name and Title*

UNITED STATES DISTRICT COURT  
NORTHERN DISTRICT OF ILLINOIS | ss

## AFFIDAVIT

I, MICHAEL J. WALSH, being duly sworn, state as follows:

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been so employed for 15 years. My current responsibilities include the investigation of narcotics trafficking offenses.

2. This affidavit is submitted in support of a criminal complaint alleging that JOSE MELENDEZ has violated Title 21, United States Code, Section 841(a)(1). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging MELENDEZ with knowing and intentional distribution of a controlled substance, namely, a mixture or substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3. The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel, and from persons with knowledge regarding relevant facts.

## INTRODUCTION

4. On five occasions between November 1, 2013 and March 26, 2014, an individual cooperating with law enforcement (the "CI") purchased powder cocaine from MELENDEZ.[1]

### A. CI's Purchase of Cocaine from MELENDEZ on November 1, 2013

5. On October 30, 2013, in the presence of law enforcement, the CI received a call from a phone number that, according to phone records, is registered to MELENDEZ. The CI recognized the voice on the phone as MELENDEZ's, and the call was recorded with the CI's consent. During this call, the CI asked MELENDEZ for a "whole onion," referring to an ounce of powder cocaine.[2] MELENDEZ said, "Mine's the real deal—anybody else is cheaper because they came like 70 percent, I heard. I don't have 70 percent. I gotta 100 percent." The CI asked, "Uh, that's going to be uh, what? 14 right? Fourteen hundred dollars, right?" MELENDEZ replied, "Yes. Yes sir." The CI said, "Man, you don't even give me a break ... you ain't no good, man." MELENDEZ said, "When you start buying up more than one, I'll hook you up." The two agreed to meet two days later, around

---

[1] The CI is a member of a street gang. He has one prior conviction for unlawful use of a weapon by a felon, three prior convictions for drug offenses, two convictions for resisting an officer, and 15 or more arrests for offenses including assault, arson, weapons, and traffic and ordinance violations.

[2] To the extent I use quoted language from consensually recorded conversations, these quotes are drawn from a careful review of the conversations but still are in draft format and not intended to be final quotations or transcripts. For some of the conversations, I have included in brackets my understanding of what is being said. My understanding of these conversations is based on: (i) evidence gathered during the investigation; (ii) the content and context of conversations; (iii) prior and subsequent conversations; (iv) the understanding of the conversation as relayed to me by the CI; (v) my experience as a law enforcement officer; and (vi) the experience of other law enforcement officers involved in this investigation with whom I have consulted. The times listed for these conversations are approximate. Finally, the conversation summaries do not include all potentially criminal recorded conversations, or necessarily all statements or topics covered during the course of the recorded conversations.

3:30 p.m., at a store parking lot in the vicinity of North and Harlem Avenues, on Chicago's west side.

7. On November 1, 2013, at approximately 3:00 p.m., law enforcement met with the CI in the vicinity of North and Harlem Avenues. In the presence of law enforcement, the CI placed a consensually recorded call to MELENDEZ's phone, which call was answered by a voice the CI recognized as MELENDEZ's. During this call, the CI said, "What are you driving . . . I'll be there in ten, five minutes." MELENDEZ responded, "I'll be there in ten to fifteen minutes."

8. Law enforcement searched the CI and his vehicle for contraband and currency, with negative results. Law enforcement equipped the CI with an audio/video recording device and $1,400 in pre-recorded funds, to purchase one ounce of cocaine from MELENDEZ. At approximately 3:35 p.m., the CI traveled a predetermined route to the parking lot of a store near the intersection of North and Harlem Avenues, while under the constant visual surveillance of law enforcement.

9. At approximately 3:50 p.m., law enforcement observed a Nissan vehicle, bearing Illinois license plate number R44 3237, enter the store parking lot near the intersection of North and Harlem Avenues, in Chicago, and park next to the CI's vehicle (hereinafter "the Nissan vehicle"). A subsequent check of the Illinois Secretary of State database disclosed that the Nissan vehicle is registered to

JOSE MELENDEZ. According to the CI, the CI recognized the driver of the Nissan vehicle to be MELENDEZ.[3]

10. As seen by law enforcement conducting surveillance, the CI exited the CI's vehicle and entered the Nissan vehicle driven by MELENDEZ. The subsequent conversation was recorded by the device worn by the CI. During the video recording, MELENDEZ's face is visible. According to the recording, when the CI entered MELENDEZ's vehicle, the CI stated, "Park by my car—they don't have cameras right there." MELENDEZ responded, "You never know . . . cameras are hell of a witness." The CI then stated, "Don't go too far—I left my car open," and MELENDEZ responded, "Over here away from the cameras." As seen on the video recording and confirmed by the CI, MELENDEZ parked in a nearby alley and got out of the Nissan vehicle while the CI remained in the passenger seat. The CI reported that MELENDEZ then got something out of the trunk.

11. As observed on the recording, MELENDEZ got back into the driver's seat and stated to the CI, in Spanish, "This is for cooking. [Powder cocaine that will work well for cooking into crack cocaine]"[4] MELENDEZ then handed a package to the CI and stated, "This is for cook, it's perfect." According to the CI and as confirmed by the recording, the CI handed MELENDEZ the $1,400. The video recording shows MELENDEZ's face as he quietly counts the money. The CI stated,

---

[3] In addition to CI's identification of MELENDEZ's voice and appearance, surveillance officers recognized MELENDEZ from Secretary of State database photographs. Agents also compared the voice on the recorded telephone calls with the voice captured on the CI's body-recorder equipment during CI's meetings with MELENDEZ and determined that the voices were the same.

[4] The CI and MELENDEZ generally speak to one another in English. Statements made in Spanish are identified as such in the complaint and were translated by the CI and a law enforcement analyst.

4

"That smells good," referring to the cocaine. As MELENDEZ counted the money, the CI said, "Count it again . . . . I know it's fourteen [hundred] right?" After MELENDEZ finished counting, the CI said, "Cool?" MELENDEZ then drove the Nissan vehicle back to the store parking lot, where the CI got out of the Nissan vehicle and returned to the CI's vehicle.

12. At approximately 3:58 p.m., the CI traveled a predetermined route back to the debrief location, while under the constant visual surveillance of law enforcement. At the debrief location, law enforcement searched the CI and the CI's vehicle. The search revealed that the CI had a package containing one ounce (28 grams) of a white, powder substance that field-tested positive as cocaine. The CI no longer had the $1,400 in prerecorded funds. Full laboratory analysis of the 28 grams of white, powder substance is pending.

**B. CI's Purchase of Cocaine from MELENDEZ on November 13, 2013**

13. On November 12, 2013, at approximately 3:52 p.m., in the presence of law enforcement, the CI placed a consensually recorded call to MELENDEZ's phone, which call was answered by a person whose voice the CI recognized as MELENDEZ's. During that call, the CI said, "I was gonna cook a little dinner tomorrow, see if you can bring me a little onion [powder cocaine], you know?" MELENDEZ said, "Oh alright, cool." The CI and MELENDEZ agreed to meet around 5:00 p.m. the following day, at the same store near Harlem and North Avenues. The CI asked, "same thing, right?—fourteen hundred, right?" MELENDEZ replied, "It was nice, right?" The CI replied, "Yeah, it was good . . . . I

5

got to do it twice [cook it twice to produce additional crack cocaine], that's the good thing about it . . . so I made a little extra for myself."

14. On November 13, 2014, at approximately 4:45 p.m., law enforcement met with the CI in the vicinity of North and Harlem Avenues, in the same store parking lot where they met on November 1, 2013. In the presence of law enforcement, the CI placed a consensually recorded call to MELENDEZ's phone, which call was answered by a person whose voice the CI recognized as MELENDEZ's. During this call, the CI said, "Where are you?" MELENDEZ responded, "I'm at work right now—I'll be there in fifteen, twenty minutes."

15. Law enforcement searched the CI and his vehicle for contraband and money, with negative results. Law enforcement equipped the CI with an audio/video recording device and $1,400 in prerecorded funds, to purchase one ounce of cocaine from MELENDEZ. At approximately 4:47 p.m., the CI traveled a predetermined route to the parking lot of the same store near North and Harlem Avenues, in Chicago, while under the constant visual surveillance of law enforcement.

16. At approximately 5:40 p.m., law enforcement observed the same Nissan vehicle, bearing Illinois license plate number R44 3237, enter the store parking lot near North and Harlem Avenues, in Chicago, and park next to the CI's vehicle. According to the CI, the CI recognized the driver of the Nissan vehicle to be MELENDEZ. As seen by law enforcement conducting surveillance, the CI exited the CI's vehicle and entered the Nissan vehicle driven by MELENDEZ. The

subsequent conversation was recorded by the device worn by the CI. During the video recording, MELENDEZ's face is not clearly visible. However, the voice recording is clear and the voice matches that of MELENDEZ as heard on other recordings in the investigation.

17. According to the recording, the CI entered MELENDEZ's vehicle and stated, "Oh, you got the shit on you right there?" MELENDEZ replied, "Yeah." According to the CI, MELENDEZ handed the CI a package. According to the recording, the CI said, "Here you go, fourteen hundred, count it real quick, make sure it's there." The CI continued, "This is the same shit? Right?" The CI asked MELENDEZ, "How much are you going to charge me for two and a half [ounces of powder cocaine]?" MELENDEZ responded, "I take, like, I take a hundred dollars off, a hundred dollars off. So you have to bring me thirteen [hundred], thirteen [hundred] and then a regular price seven [hundred]. You save two hundred bucks." MELENDEZ continued, "That's if you getting two and a half [ounces of powder cocaine]." The CI responded, "Alright then, I'll be giving you a call." The CI then got out of MELENDEZ's vehicle and returned to the CI vehicle.

18. At approximately 5:45 p.m., the CI traveled a predetermined route back to the debrief location, while under the constant visual surveillance of law enforcement. At the debrief location, law enforcement searched the CI and the CI's vehicle. The search revealed that the CI had a package containing one ounce (28 grams) of a white, powder substance that field-tested positive as cocaine. The CI no

7

longer had the $1,400 in in prerecorded funds. Laboratory analysis confirmed that the white, powder substance was cocaine, with a net weight of 27.8 grams.

### C. CI's Purchase of Cocaine from MELENDEZ on January 16, 2014

19. On January 15, 2014, at approximately 4:36 p.m., in the presence of law enforcement, the CI placed a consensually recorded call to MELENDEZ's phone, which call was answered by a person whose voice the CI recognized as MELENDEZ's. During that call, MELENDEZ asked, "What's the word, you ready?" The CI understood MELENDEZ to be asking if the CI was ready to order cocaine from MELENDEZ. The CI responded, "Don't kill me on the price," and continued, "It's going to be twenty-eight [hundred dollars], right?" MELENDEZ responded, "Yes sir. Yes sir." The CI and MELENDEZ agreed to meet the following day at the same store near North and Harlem Avenues.

20. On January 16, 2014, at approximately 4:43 p.m., law enforcement met with the CI in the vicinity of North and Harlem Avenues. In the presence of law enforcement, the CI placed a consensually recorded call to MELENDEZ's phone, which call was answered by a person whose voice the CI recognized as MELENDEZ's. During this call, the CI said, "What up fool? Where you at?" MELENDEZ responded that he was "in route" and the two said they would meet in ten minutes.

21. Law enforcement searched the CI and his vehicle for contraband and money, with negative results. Law enforcement equipped the CI with an audio/video recording device and $2,800 in prerecorded funds, to purchase two

ounces of cocaine from MELENDEZ. At approximately 4:54 p.m., the CI traveled a predetermined route to the same store near the intersection of North and Harlem Avenues, in Chicago, while under the constant visual surveillance of law enforcement.

22. At approximately 5:08 p.m., law enforcement observed a Ford vehicle, bearing Illinois license plate number S21 7090, enter the parking lot of the near the intersection of North and Harlem Avenues, in Chicago, Illinois, and park next to the CI's vehicle (hereinafter "the Ford vehicle"). A subsequent check of the Illinois Secretary of State database disclosed that the Ford vehicle is registered to JOSE MELENDEZ. According to the CI, the CI recognized the driver of the Ford vehicle to be MELENDEZ. As seen by law enforcement conducting surveillance, the CI exited the CI's vehicle and entered the Ford vehicle driven by MELENDEZ, which MELENDEZ drove to a nearby street, also in Chicago, Illinois, for a short time, and then returned to the store parking lot. The conversation between MELENDEZ and the CI was recorded by the device worn by the CI. During the video recording, MELENDEZ's face is visible.

23. According to the recording, when the CI entered MELENDEZ's vehicle, the CI stated, "What's up doggie? I didn't recognize you, what's this, a Ford Escape or some shit?" According to the CI, MELENDEZ handed the CI a package. The CI stated, "Is this the same shit?" According to the CI, the CI handed MELENDEZ the $2,800 in prerecorded funds. The CI then stated, "Count it, we're dealing with a lot of money bro." The CI stated, "Hey bro, you're going to have to give me a break on

the price, cause I'm getting three and a half [ounces] probably next time." MELENDEZ asked, "How much are you picking it up for an ounce [of powder cocaine], be honest?" The CI responded, "They're giving it to me for twelve [hundred] here and there." MELENDEZ said, "If you buy two or three [ounces of powder at a time], I'll probably give you like thirteen [hundred dollars], and you save a hundred dollars for each one [ounce]." The CI then exited MELENDEZ's vehicle and returned to the CI's vehicle.

24. At approximately 5:12 p.m., the CI traveled a predetermined route back to the debrief location, while under the constant visual surveillance of law enforcement. At the debrief location, law enforcement searched the CI and the CI's vehicle. The search revealed that the CI had a package containing two ounces (56 grams) of a white, powder substance that field-tested positive as cocaine. The CI no longer had the $2,800 in prerecorded funds. Laboratory analysis confirmed that the white, powder substance was cocaine, with a net weight of 56.3 grams.

**D. CI's Purchase of Cocaine from MELENDEZ on February 12, 2014**

25. On February 11, 2014, at approximately 5:10 p.m., the CI placed a consensually recorded call to MELENDEZ's phone, which was answered by a person whose voice the CI recognized as MELENDEZ's. During this call, the CI stated, "Can I get another of those two things [two ounces of powder cocaine] for tomorrow?" MELENDEZ responded, "Same time tomorrow after work." The CI stated, "Is it the same price?" MELENDEZ responded, "I'm pissed because I'm paying thirty-six flat." [MELENDEZ is paying $36,000 for a kilogram of cocaine].

MELENDEZ stated "I'm making something when I break it down to little ones like you're doing." The CI stated, "I'll have twenty-eight [hundred] for you tomorrow."

26. On February 12, 2014, at approximately 4:10 p.m., law enforcement met with the CI in the vicinity of North and Harlem Avenues. In the presence of law enforcement, the CI placed a consensually recorded call to MELENDEZ's phone, which call was answered by a person whose voice the CI recognized as MELENDEZ's. During this call, the CI said, "I'm about five, ten minutes away from the spot." MELENDEZ responded, "I should be there in about ten, fifteen minutes." The CI responded, "Okay, no problem."

27. Law enforcement searched the CI and his vehicle for contraband and money, with negative results. Law enforcement equipped the CI with an audio/video recording device and $2,800 in prerecorded funds, to purchase two ounces of powder cocaine from MELENDEZ. At approximately 4:18 p.m., the CI traveled a predetermined route to the parking lot of a store near the intersection of North and Harlem Avenues, in Chicago, while under the constant visual surveillance of law enforcement.

28. At approximately 4:43 p.m., law enforcement observed the Ford vehicle MELENDEZ drove on January 16, 2014, enter the store parking lot near North and Harlem Avenues, in Chicago, and park next to the CI's vehicle. According to the CI, the CI recognized the driver of the Ford vehicle to be MELENDEZ. As seen by law enforcement conducting surveillance, the CI exited the CI's vehicle and MELENDEZ exited the Ford vehicle. The conversation that followed was recorded

by the equipment worn by the CI, and MELENDEZ's face is visible in the video recording.

29. As recorded by the device worn by the CI, the two spoke briefly to each other outside the vehicles, where MELENDEZ opened the hood of the Ford vehicle. According to the CI, MELENDEZ retrieved a package from under the hood of the vehicle. MELENDEZ and the CI then got into the Ford vehicle, at which point MELENDEZ gave the package to the CI.

30. According to the recording, during the conversation between MELENDEZ and the CI in the vehicle, the CI asked, "Is this the same shit you gave me last time?" MELENDEZ responded, "This is fire, this is better." The CI stated, "The shit you gave me last time was good as hell." MELENDEZ said, "No, this is good. You'll love it. You'll love it." According to the CI, the CI gave MELENDEZ the $2,800 in prerecorded funds and said, "You got twenty-eight there." MELENDEZ and the CI then exited the Ford vehicle. As observed on the video recording, MELENDEZ closed the hood to the Ford vehicle and got back into the vehicle. Surveillance observed the Ford vehicle leave the parking lot.

31. At approximately 4:49 p.m., the CI traveled a predetermined route back to the debrief location, while under the constant visual surveillance of law enforcement. At the debrief location, law enforcement searched the CI and the CI's vehicle. The search revealed that the CI had a package containing two ounces (56 grams) of a white, powder substance that field-tested positive as cocaine. The CI no

longer had the $2,800 in prerecorded funds. Full laboratory analysis of the 56 grams of white, powder substance is pending.

### E. CI's Purchase of Cocaine from MELENDEZ on March 26, 2014

32. On March 25, 2014, at approximately 5:43 p.m., the CI placed a consensually recorded call to MELENDEZ's phone, which call was answered by a voice the CI recognized as MELENDEZ's. According to the recorded call, the CI asked MELENDEZ, "I want the usual for tomorrow." MELENDEZ responded, "Alright cool, cool, two times [two ounces of cocaine]?" The CI responded, "Yeah, two times . . . . can you give me break on the price?" MELENDEZ responded, "I'll give you a play, bring me twenty-six [$2,600]." The CI responded, "Twenty-six, that sounds good." The CI asked MELENDEZ, "It must be good shit anyways." MELENDEZ responded, "It's fire, bro [high-quality cocaine]." The CI and MELENDEZ agreed to meet the next day between approximately 4:15 and 4:30 p.m.

33. On March 26, 2014, at approximately 4:23 p.m., law enforcement met with the CI near Harlem and North Avenues, near Chicago's west side. Law enforcement searched the CI and his vehicle for contraband and currency, with negative results. Law enforcement equipped the CI with an audio/video recording device and $2,600 in pre-recorded funds, to purchase two ounces of cocaine from MELENDEZ. At approximately 3:35 p.m., the CI traveled a predetermined route to the parking lot of a store near the intersection of North and Harlem Avenues, in Chicago, while under the constant visual surveillance of law enforcement.

34. At approximately 5:12 p.m., law enforcement observed the same Ford vehicle in the store parking lot near the intersection of North and Harlem Avenues, in Chicago, with the hood up. According to the CI, the CI recognized the driver of the Ford vehicle to be MELENDEZ. As seen by law enforcement conducting surveillance, MELENDEZ removed an object from the engine area of the vehicle and re-enter the Ford vehicle. Surveillance observed MELENDEZ drive the Ford vehicle to a nearby residential area, while the CI followed in the CI's vehicle. In the residential area, MELENDEZ got out of the Ford vehicle and into the CI's vehicle. The subsequent conversation between MELENDEZ and the CI was recorded by the device worn by the CI. During the video recording, MELENDEZ's face is visible. When MELENDEZ got into the CI's vehicle, the CI said, "I got twenty-six, right, that's what it was?" MELENDEZ replied, "Cut that. That's fire [high quality cocaine]. Trust me." MELENDEZ explained to the CI how to add a cutting agent to the cocaine, to maximize profits. Later in the conversation, MELENDEZ said, "You will love it, trust me." The CI said, "Man, it's that good, huh. Don't trip. We are going to make that money." MELENDEZ said, "I will make sure you make money, if you can keep coming back to me." MELENDEZ returned to the Ford vehicle and the departed the area.

35. At approximately 5:21 p.m., the CI traveled a predetermined route back to the debrief location, while under the constant visual surveillance of law enforcement. At the debrief location, law enforcement searched the CI and the CI's vehicle. The search revealed that the CI had a package containing two ounces (56

grams) of a white, powder substance that field-tested positive as cocaine. The CI no longer had the $2,600 in prerecorded funds. Full laboratory analysis of the 56 grams of white powder is pending.

## CONCLUSION

36. Based on the foregoing information, there is probable cause to believe that, on or about January 16, 2014, at Chicago, in the Northern District of Illinois, Eastern Division, JOSE MELENDEZ, did knowingly and intentionally distribute a controlled substance, namely, a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

FURTHER AFFIANT SAYETH NOT.

_____
MICHAEL J. WALSH
Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives

SUBSCRIBED AND SWORN to before me on July 22, 2014.

_____
YOUNG B. KIM
United States Magistrate Judge